UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| ZACHARY JENKINS, on behalf of himself and others similarly situated, | : : : | Case No. 1:23-cv-00558-JPH |
| *Plaintiff(s),* | : : | District Judge Jeffery P. Hopkins |
| v. | : : : | |
| ZETA GLOBAL CORP. and FLUENT, INC. | : : : | |
| *Defendants.* | : | |

**PLAINTIFF'S OPPOSITION TO ZETA GLOBAL CORP.
MOTION TO COMPEL ARBITRATION OR TO DISMISS**

**INTRODUCTION AND BACKGROUND**

Zeta Global Corp. has moved to compel arbitration based on a purported website visit and consent to a so-called clickwrap agreement found on the websites the onlygreatjobs.com and higherincomejobs.com. Zeta contends that Jenkins visited *onlygreatjobs.com* on June 6, 2023, and *higherincomejobs.com* on June 19, 2023, and submitted online forms requesting to be contacted.  ECF 28 at 1. Zeta argues that by visiting these and checking certain boxes, Jenkins consented to receive telemarketing. ECF No. 15 ¶¶18-27.  But Plaintiff has never heard of the websites *onlygreatjobs.com* and *higherincomejobs.com* and was retired when he is alleged to have visited these job-search websites and agreed to arbitrate. Further, the IP address listed in Zeta's declaration does not match Jenkins'. Thus, Zeta alleges that Jenkins visited websites that he had no incentive to visit using an IP address that is not his. Because Jenkins never visited these websites, never submitted his information, and never agreed to arbitrate Zeta's motion should be denied.

1

Americans are subject to billions of unwanted telemarketing calls per year. *See In re Call Authentication Trust Anchor*, 36 FCC Rcd. 8827, 8832 n. 41 (May 21, 2021) ("March 2021 saw a record number of 'spam' calls, reaching 6.3 billion, greater than the previous monthly high in October 2020 of 6.1 billion and on pace to exceed 70 billion calls in 2021.") (internal citations omitted). Many of these unwanted solicitations stem from the lead generation industry, which uses unscrupulous tactics to harvest and resell consumer contact information. Said differently, lead generators act as middlemen, capturing contact information and then providing those "leads" to third-party businesses that then badger consumers.[1]

This case concerns telemarketing calls that Plaintiff never consented to and did not request, and which were therefore made in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. ("TCPA"), to market third-party insurance and employment-related offerings. Zeta seeks to avoid this lawsuit by compelling arbitration based on the allegation that Plaintiff submitted his telephone number on third-party websites—*onlygreatjobs.com* and *higherincomejobs.com*—and agreed to arbitrate any resulting disputes.

In support of its motion to compel arbitration, Zeta relies on a declaration and business records that it claims show Plaintiff visited those websites, submitted his personal information, and assented to website terms containing an arbitration provision. Plaintiff disputes that account. Plaintiff has submitted a sworn declaration stating that he did not visit *onlygreatjobs.com* or *higherincomejobs.com*, did not submit online requests for job-related calls, had no notice of any arbitration provision, and did not agree to arbitrate any claims against Zeta.

---

[1] *See* Fed. Trade Comm'n, Staff Perspective: "Follow the Lead" Workshop 2 (Sept. 2016), https://www.ftc.gov/system/files/documents/reports/staff-perspective-follow-lead/staff_perspective_follow_the_lead_workshop.pdf.

2

Zeta's evidence does not resolve that dispute. No one at Zeta claims to have personally observed Plaintiff visit either website or agree to any clickwrap or browsewrap terms. Instead, Zeta relies on database records and generalized descriptions of how a user would interact with its websites. Plaintiff, by contrast, has personal knowledge of his own actions and has denied that he submitted the online forms on which Zeta relies or agreed to arbitrate his claims. Zeta's submission is not proof that Mr. Jenkins personally visited the websites or manifested assent. At most, it shows that someone using Mr. Jenkins's name and phone number allegedly completed online submissions. But the critical question is identity: whether *Mr. Jenkins himself* was the person who took those actions. Zeta offers no individualized proof tying the alleged website activity to Mr. Jenkins—no device identifier, no browser fingerprint, no contemporaneous confirmation email or text to Mr. Jenkins, no user-agent data, and no evidence excluding the possibility that the submission came from a third party, a lead-generator, an automated script, or an unauthorized actor. Because Zeta cannot connect the alleged submissions to Mr. Jenkins personally, Zeta has not met its burden to show that Mr. Jenkins agreed to arbitrate anything.

Separately, Zeta has not carried its burden to show that the alleged terms were presented in a manner that would give a reasonable consumer notice of arbitration and a class waiver. Zeta does not provide a full, date-stamped capture of the exact page layout as it appeared on June 6 and June 19, 2023, including the size, placement, and visibility of any hyperlink to terms, the complete text of any disclosures, or whether any checkbox was required or pre-selected. Without competent proof of what Mr. Jenkins would have seen on the screen—and how assent was captured—the Court cannot conclude that any agreement to arbitrate was formed, even assuming a visit occurred.

Even if Mr. Jenkins had visited either website (which he did not), Zeta still must prove it has the right to enforce the arbitration clause contained in those website terms. Zeta is not the website user's contracting counterparty; the alleged agreement is between the website operator and the visitor. A third party cannot compel arbitration unless it establishes a recognized basis to enforce the contract. Zeta does not show that it is a party to the terms, that it is expressly included as a beneficiary, or that the terms clearly extend arbitration rights to downstream marketers and third-party lead buyers. Because Zeta has not established any basis to enforce the website's arbitration provision against Mr. Jenkins, the motion must be denied for that independent reason.

On this record, Zeta has not established the existence of a valid arbitration agreement or that Plaintiff knowingly consented to arbitrate his TCPA claim.

STANDARD OF REVIEW

In evaluating a motion to compel arbitration in a TCPA case, the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1 *et seq.*, governs the enforceability of an arbitration agreement. That statute commands that before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4 (directing that courts must direct the parties to arbitration "upon being satisfied that the making of the agreement for arbitration . . . is not in issue"). That issue is for the court, not the arbitrator, to decide, even when there is a valid delegation provision. here is a difference between disputes over arbitrability and disputes over contract formation. *Boykin v. Family Dollar Stores of Mich., LLC* 3 F. 4th 832 (6th Cir. 2021) (if resisting party puts "the making of the arbitration contract 'in issue'" . . . the district court has an obligation to evaluate whether an arbitration contract was formed ). When a motion to compel arbitration is brought by a party, courts must first determine whether the parties agreed to

4

arbitrate. *Id.* If the record shows a material issue of fact on whether the parties had an agreement to arbitrate the party resisting arbitration is entitled to a trial.) *Id.* The party seeking to compel arbitration bears the burden of proving a valid agreement to arbitrate. *Memmer v. United Wholesale Mortg., LLC,* 135 F.4th 398, 404 (6th Cir. 2025). And while doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration, the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made. *See AT&T Techs. v. Communications Workers of Am.*, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986); *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003).

## ARGUMENT

1. **There is no agreement to arbitrate because Plaintiff has provided evidence that they never agreed to arbitrate.**

"Arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010). The Supreme Court has held time and time again that, despite the liberal policy favoring arbitration, "consent" remains a "first principle that underscores" all arbitration decisions. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) Consent is essential under the FAA because arbitrators wield only the authority they are given. *Id.* The Supreme Court has held time and time again that, despite the liberal policy favoring arbitration, "consent" remains a "first principle that underscores" all arbitration decisions. *Id.* Consent is essential under the FAA because arbitrators wield only the authority they are given. *Id.* Defendant cannot invoke any arbitration clause against Jenkins because the factual question of whether the Plaintiff even agreed as a matter of contract is called into issue, as Jenkin's declaration points out that he never visited the websites and the information Defendant contends was submitted was not submitted by him. Under Section 4 of the Federal Arbitration Act, a jury *must* decide this as a

5

threshold to the threshold arbitrability matter, and jurisdiction lies with the Court on this issue, as confirmed by the Supreme Court in *Coinbase*, *infra*. As the party seeking to compel arbitration, Defendant bears the burden of proving both that a legally valid arbitration agreement exists and that Plaintiff himself agreed to be bound by it with adequate notice. See *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624–25 (6th Cir. 2003) (before compelling arbitration, court must determine whether a valid agreement to arbitrate exists and whether the dispute falls within its scope); *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 392 (6th Cir. 2003) (party seeking arbitration must prove existence of an arbitration agreement and assent under ordinary contract principles).

      The Supreme Court recently addressed the proper procedure to follow when conflicts arise as to the existence of arbitration contracts. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 143 (2024). The Supreme Court held that the first question in any arbitration dispute must be what the parties agreed to. *Id.* at 145. The Supreme Court clarified that *this* "fundamental" question is one for the *court*, not the arbitrator, to decide, and is driven by contractual interpretation principles under state contract law. *Id.* In *Coinbase*, the Supreme Court reaffirmed that "where, as here, a challenge applies "equally" to the whole contract and to an arbitration or delegation provision, a *court* must address that challenge." *Id.* at 151 (*quoting Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 71 (2010). The Court went on to explain that in such cases, just like here, "basic principles of contract and consent require that result. Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute." *Id.* (quoting *Rent-A-Ctr.*, 561 U.S. at 71 for the proposition that "If a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that [arbitration] agreement."). And the explicit text of Section 4 makes it clear

that formation is a *jury* issue, "upon such demand the court shall . . . specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed." 9 U.S.C. § 4. As such, a jury trial is necessary to ascertain if the Plaintiff himself submitted his information to the relevant websites and thus agreed to arbitrate, as the evidence in support of this is disputed. "It goes without saying that a contract cannot bind a nonparty." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002). Thus the FAA does not require parties to arbitrate when they have not agreed to do so," *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). The FAA commands that, before compelling arbitration of a dispute, the Court must first be satisfied that the parties agreed to arbitrate that dispute. 9 U.S.C. § 4; see also *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute."). And, "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

"Arbitration is a favored form of dispute settlement under Ohio law and federal law." *Fifth Third Bank v. Rowlette*, 10th Dist. Franklin No. 13AP-337, 2013-Ohio-5777, ¶ 7, citing *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 500, 1998 Ohio 612, 692 N.E.2d 574 (1998); *Preston v. Ferrer*, 552 U.S. 346, 353, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008). Courts recognized, however, that arbitration is a matter of contract. *Id.* Thus, a party cannot be compelled to submit a dispute to arbitration without expressly agreeing to the arbitration terms. *Id*, citing *Benjamin v. Pipoly*, 155 Ohio App.3d 171, 2003-Ohio-5666, 800 N.E.2d 50, ¶ 32 (10th Dist.); see also *Harmon v. Philip Morris, Inc.*, 120 Ohio App.3d 187, 189, 697 N.E.2d

7

270 (8th Dist.1997); *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648-649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) ("[arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit * * *"). Especially in Ohio, "there is a counter-weighing presumption against arbitration when a party seeks to invoke an arbitration provision against a nonsignatory." *Rowlette*, citing *Taylor v. Ernst & Young, L.L.P.*, 130 Ohio St.3d 411, 2011-Ohio-5262, 958 N.E.2d 1203, ¶ 21. The party seeking to compel arbitration bears the burden of establishing the existence of an enforceable arbitration agreement between the party against whom the moving party seeks enforcement. Yet Zeta has not and cannot prove that Jenkins agreed to arbitrate.

| Allegation | Plaintiff's Position |
|---|---|
| Plaintiff visited onlygreatjobs.com (June 6, 2023) and entered his information | Plaintiff did not visit the site or submit anything. |
| Submission came from IP 99.11.193.101 | Plaintiff did not use that IP; it is not associated with him. |
| Plaintiff visited higherincomejobs.com (June 19, 2023) and entered his information | Plaintiff did not visit the site or submit anything. |
| Submission came from IP 172.59.33.186 | Plaintiff did not use that IP; it is not associated with him. |
| Plaintiff was seeking job-related contact | Plaintiff retired in August 2022. He was not looking for a job. He underwent surgery on March 23, 2023 and remained in rehabilitation until June 30, 2023, making the claimed "job-seeker" submissions implausible. |

Jenkins Declaration ¶¶ 3-11. The IP address mismatch is not a minor discrepancy—it goes to the core of whether Mr. Jenkins was the person who supposedly completed the online submissions. If Zeta cannot show that the IP addresses used for the submissions are associated with Mr. Jenkins, his home internet service, his mobile carrier, or a location where he was present, Zeta cannot

plausibly attribute the website activity to him. A consumer cannot be bound to arbitration based on website activity that cannot be traced to him. The mismatch further supports Mr. Jenkins's sworn testimony that he did not visit these websites and did not assent to any arbitration clause.

The alleged submissions are also implausible on their face. The websites at issue are job-search lead forms, yet Mr. Jenkins retired in August 2022 and was not seeking employment. In addition, he underwent knee surgery on March 23, 2023 and remained in rehabilitation through June 30, 2023—making it highly unlikely he was browsing and requesting job-related calls during the relevant period. These facts corroborate his sworn denial and further undermine Zeta's claim that the submissions reflect Mr. Jenkins's conduct or intent.

Because Jenkins never submitted this information to Defendant directly or indirectly, he never consented to arbitrate his claims. At this stage, particularly as this case raises a factual challenge surrounding contract formation, the Plaintiff is entitled to submit a declaration of his own in support of his position that he did not agree to arbitrate the dispute as an initial matter. *Gerrish v. Coast Pump & Supply Co.*, No. 8:21-cv-365-JSS, 2021 U.S. Dist. LEXIS 202979, at *2-4 (M.D. Fla. Oct. 21, 2021).

To be clear, Plaintiff denies ever having agreed to arbitrate. Plaintiff confirms that he did not visit the websites, had nothing to do with the purported website visit, and thus did not agree to arbitrate anything. (Jenkins Dec. ¶¶ 2). These factual disputes create issues of material fact and entitle Plaintiff to a jury trial on the question of whether the parties agreed to arbitrate. Despite Defendant's faulty evidence which demonstrates that it possesses no information that the Plaintiff himself, and not something like a website scraper or bot, submitted Plaintiff's information, and the Plaintiff's own denials, Defendant's motion is rife with the false and unsupported assertion that the "Plaintiff" submitted *his* phone number to the website in question. But, under well-established

TCPA and arbitration law, the Defendant must establish that the Plaintiff *himself*, and not someone else, agreed to arbitrate claims. *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024 WL 1258501, at *5 (D. Mass. Mar. 25, 2024) (denying motion to compel arbitration and holding non-signatory family member was not bound by arbitration agreement despite being listed as an alternate contact on account).

Several decisions dictate that the Defendant's motion ought to be denied on the basis of the Plaintiff's declaration *alone*. The Middle District of Georgia's decision in *Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863 (M.D. Ga. Dec. 17, 2019), is particularly instructive. There, a TCPA defendant sought to compel arbitration by contending, as here, that the plaintiff agreed to an arbitration provision as a result of his visits to the defendant's website. In finding no agreement to arbitrate existed, the court explained:

> Plaintiff presented evidence that he "did not visit www.bestautoinsurance.com" and that it would have been impossible for him to access the website in the manner Defendant says he did. . . . Plaintiff stated that he "cannot know for certain who accessed" Defendant's website and input his information, but "[w]hat [he] do[es] know for certain is that [he] did not visit www.bestautoinsurance.com." From this, a reasonable factfinder could determine that Plaintiff did not enter his personal information on Defendant's website or click "submit." So, a reasonable factfinder could conclude that Plaintiff did not assent to the website's terms, including the arbitration provision. Accordingly, there is a genuine fact dispute as to whether Plaintiff entered an arbitration agreement with Defendant, and the Court thus cannot conclude as a matter of law at this stage in the proceedings that the parties had a valid agreement to arbitrate. For this reason, Defendant's motion to dismiss in favor of arbitration is denied.

*Id.* at *1-*2 (cleaned up). *Hobbs* is one of several in a long line of cases either denying such motions outright or ultimately concluding that a summary arbitration trial was necessary. *E.g.*, *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033, 2025 WL 1126545, at *4 (M.D. Tenn. Apr. 16, 2025 ("[O]ther than the fact that Plaintiff's name and phone number were used, Prince Health offers no evidence that Plaintiff was the person who entered the information."); *Woodard v. SmartMatch Ins. Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at *3 (N.D. Ill. Sept. 20,

2024).

The Court in *Conrad v. Camping World Holdings Inc.* reached a similar conclusion, reasoning that the factual question of whether the plaintiff opted in to receive text messages from the defendant on a website containing an arbitration provision was put at issue and denied a similar motion to compel arbitration. No. 4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025). There, the court first agreed that its decision "as to whether an arbitration agreement exists is simply a matter of contract," and that when a party does not "sign or otherwise enter the contract, he cannot be bound by its terms." *Id.* The court noted that the defendant provided no evidence to controvert the plaintiff's declaration, as here, that he did not agree to arbitrate any claims because he did not own the telephone number at issue at the time of the alleged opt-in, and thus that the defendant could not "show the parties had a meeting of the minds about arbitrating claims related to the CWH text message service." *Id.*

As a result, Defendant has been and will be unable to meet its burden of demonstrating even a genuine issue entitling the Plaintiff to wholesale denial of the motion. The court in *Conrad* did the same, holding as a matter of law that the defendant did not meet its burden of demonstrating a disputed factual issue with respect to the claimed provision to justify an arbitration trial. *Id.* And, like in *Hobbs*, the Plaintiff has made similar allegations of faulty arbitrational facts, including his physical location and other mismatched information. 2019 WL 6878863, at *1–*2. And because the Plaintiff agreed to nothing, he did not agree to arbitrate or receive calls.

2. **Even if an Arbitration Agreement were formed, the purported arbitration clause is unenforceable under Ohio contract defenses.**

11

Even where the Federal Arbitration Act governs, arbitration agreements remain "simply contracts" and are subject to generally applicable defenses, including unconscionability. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). Under Ohio law, unconscionability has both procedural and substantive components. *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St. 3d 352, 2008-Ohio-938, 884 N.E.2d 12, (2008. A court may refuse to enforce an arbitration clause where the record demonstrates an absence of meaningful choice in formation and terms that are unfairly one-sided. *Id.*; *Hayes v. Oakridge Home*, 122 Ohio St. 3d 63 (2009).

Procedural unconscionability focuses on whether the circumstances of the transaction deprive the consumer of meaningful choice or real notice of the waiver of rights. "Factors which may contribute to a finding of unconscionability in the bargaining process [i.e., procedural unconscionability] include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical [***23] or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors." *Taylor Bldg. Corp. of Am.* at 352. Here, Zeta relies on a purported website flow in which a consumer's entry of information on a job-lead form allegedly binds the consumer to a sweeping arbitration clause and class waiver contained in website Terms of Use. But Zeta does not show that the arbitration clause was presented in a manner that would reasonably convey to a consumer that he was waiving constitutional rights to jury trial, court access, and class relief. Even accepting Zeta's description of the website screens for purposes of this argument, the arbitration clause is not displayed as a transaction-blocking

12

term at the point of entry, but instead exists within a longer Terms of Use document. Such "take-it-or-leave-it" consumer web terms, especially where the alleged assent occurs in a rapid lead-form context and the arbitration term is not highlighted as the key legal consequence of the submission, strongly supports procedural unconscionability.

An assessment of whether a contract is substantively unconscionable involves consideration of the terms of the agreement and whether they are commercially reasonable. *Dorsey v. Contemporary Obstetrics & Gynecology, Inc.* (1996), 113 Ohio App.3d 75, 80, 680 N.E.2d 240 (2009). Factors courts have considered in evaluating whether a contract is substantively unconscionable include the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability. *Collins v. Click Camera*, 86 Ohio App.3d at 834, 621 N.E.2d 1294 (1999).

Here, the arbitration provision is not merely a bilateral agreement between a consumer and the website operator; it is drafted to maximize enforcement by a broad, undefined group of third parties. Zeta's own motion confirms that the agreement purports to grant "third-party beneficiaries" the same rights to enforce arbitration as the website operator itself—i.e., any entity with whom the user's phone number is shared. (ECF 28 at 10–11.) That structure creates a substantial fairness problem: it requires a consumer to arbitrate not only disputes with the website operator but also disputes with unknown downstream marketers and buyers—entities the consumer has never heard of and never intentionally selected. Ohio courts recognize that substantive unconscionability may exist where contract provisions operate in a one-sided or oppressive manner and where they strip the weaker party of meaningful remedies while expanding enforcement rights for the drafter. *Taylor Bldg.*, 2008-Ohio-938, ¶¶ 35–36; *Hayes*, 2009-Ohio-2054, ¶ 20. The clause here does exactly that: it forces arbitration and waives class

13

relief while simultaneously expanding enforcement to an amorphous class of beneficiaries whose identity and conduct are unknown at the time of purported assent. That one-sided expansion is particularly problematic in a TCPA setting, where the practical ability to vindicate claims frequently depends on class procedures and where the alleged harm arises from mass telemarketing practices executed by large commercial actors.

### 3. Plaintiff has plausibly alleged a claim for injunctive relief.

Plaintiff has standing to pursue injunctive relief. Even a TCPA plaintiff who is no longer receiving calls has Article III standing to seek injunctive relief on behalf of a class where he plausibly alleges a continuing threat of unlawful calls to class members. Plaintiff has done so here by alleging that Defendants systematically place telemarketing calls to individuals whose numbers are listed on the National Do Not Call Registry. See SAC ¶¶ 1–5, 29–37 (alleging that Zeta placed telemarketing calls to Plaintiff and others similarly situated without consent and that Fluent monetized those calls through its call-transfer platform).

"The Supreme Court has recognized that when the time frame for the alleged injury is by nature temporary, a named plaintiff can continue to pursue the interests of the class even after his own claim has been rendered moot. Otherwise, a defendant could evade prospective injunctive relief simply by inflicting harms that are too transitory to last the length of an entire lawsuit or, in this case, by ceasing the alleged violations with respect to plaintiffs who step forward." *Snyder v. Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 901 (N.D. Ill. 2017) (citation omitted). Accordingly, the *Snyder* court rejected the argument that a plaintiff cannot pursue injunctive relief for a class once he stops receiving calls:

> If this were sufficient to defeat standing, [the defendant] would be able to cease calls to any individual the instant he joined the case as a named plaintiff and thereby indefinitely avoid injunctive relief, while keeping the allegedly unlawful practices in effect. A defendant's choice to end the challenged behavior—where he remains free to resume the unlawful conduct at any time—is insufficient to render plaintiff's claim moot.

*Id.* at 901 (citation omitted).

Thus, Plaintiff need not allege that he continues to receive calls. The Supreme Court has long recognized an exception to mootness in class actions where it is "by no means certain that any given individual would be [subject to the unlawful conduct] long enough for a district judge to certify the class." *Robinson v. City of Chicago*, 868 F.2d 959, 968 (7th Cir. 1989) (citing Gerstein v. Pugh, 420 U.S. 103, 110 n.11 (1975)). When the alleged injury is inherently transitory, a named plaintiff may continue to pursue injunctive relief for the class even after his individual claim has ceased. Gerstein, 420 U.S. at 110 n.11. Otherwise, defendants could evade injunctive relief simply by stopping the challenged conduct as to any plaintiff who comes forward. To invoke this exception, the named plaintiff must have had a live claim at the time the complaint was filed, which Plaintiff plainly did here. *See Sosna v. Iowa*, 419 U.S. 393, 402 (1975); Robinson, 868 F.2d at 968 ("[A] representative's claim must at least be live when he files the case.").

For statutory injunctions under the TCPA, "Article III's standing requirement centers on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Edgar v. Haines,* 2 F.4th 298, 310 (4th Cir. 2021) (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). At this stage—before any discovery—Plaintiff's allegations are more than sufficient to establish standing to seek injunctive relief on behalf of the putative class. See *Owens-Benniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300, 1314–15 (M.D. Fla. 2017) (denying motion to dismiss prayer for injunctive relief under the TCPA); Snyder, 258 F. Supp. 3d at 900–01 (allowing classwide injunctive relief despite named plaintiffs no longer receiving calls); *Griffith v.*

15

*ContextMedia, Inc.*, 235 F. Supp. 3d 1032, 1033–35 (N.D. Ill. 2016).

Courts have reached the same conclusion in analogous TCPA cases. *See Burke v. Credit One Bank, N.A.*, No. 8:18-cv-00728-EAK-TGW, 2019 U.S. Dist. LEXIS 62770, at *11–12 (M.D. Fla. Feb. 5, 2019) (denying motion to dismiss or strike injunctive relief prior to discovery and class certification); *Wijesinha v. Bluegreen Vacations Unlimited, Inc.*, No. 19-20073-CIV, 2019 U.S. Dist. LEXIS 57136, at *18–19 (S.D. Fla. Apr. 3, 2019).

For the same reasons, Defendants' request to strike class allegations should also be denied. Whether certification under Rule 23(b)(2) or Rule 23(b)(3) is appropriate cannot be resolved at the pleading stage, before discovery into the scope and nature of Defendants' calling practices. *See Spurlark v. Dimension Serv. Corp.*, 2022 U.S. Dist. LEXIS 120468, at *19 (S.D. Ohio 2022). Accordingly, Plaintiff has Article III standing to pursue injunctive relief on behalf of the putative class, and Defendants' motion to dismiss.

## CONCLUSION

Plaintiff has plausibly alleged that the calls he received were generated and transferred through a lead-generation system designed to profit from outbound telemarketing and that Zeta placed those calls on Fluent's behalf as part of that model. The Second Amended Complaint alleges that Fluent controlled the transfer conditions and routing, compensated vendors like Zeta for producing leads, and monetized the transferred calls by selling them to advertisers. Those allegations support vicarious liability under multiple agency theories and are more than sufficient at the pleading stage.

Fluent's motion asks the Court to resolve disputed factual issues based on declarations, rather than accepting Plaintiff's well-pled allegations and permitting discovery into a relationship that is uniquely within Fluent's possession. The TCPA's protections would be undermined if

16

entities could structure lead-transfer marketplaces around unlawful telemarketing, profit from the resulting calls, and then avoid both liability and jurisdiction by outsourcing dialing to intermediaries.

For these reasons, Fluent's motion to dismiss should be denied. Alternatively, if the Court concludes the present record is insufficient to resolve personal jurisdiction, Plaintiff respectfully requests limited jurisdictional discovery narrowly tailored to the Fluent–Zeta relationship and the call-transfer conduct alleged in the Second Amended Complaint.

## Conclusion

Zeta's motion rests on the premise that Plaintiff visited onlygreatjobs.com and higherincomejobs.com, submitted personal information, and assented to a clickwrap arbitration agreement. Plaintiff has submitted sworn testimony denying each of those facts and identifying multiple reasons why the alleged submissions are implausible, including retirement, rehabilitation, and IP address discrepancies. Zeta's generalized database records and process descriptions do not resolve these disputes or establish that Plaintiff personally agreed to arbitrate. Because the making of the arbitration agreement is squarely "in issue," the Court cannot compel arbitration on this record.

Accordingly, Zeta's Motion to Compel Arbitration should be denied. In the alternative, if the Court determines that further proceedings are required, Plaintiff respectfully requests that the Court permit limited discovery directed to contract formation and conduct a summary trial under 9 U.S.C. § 4 on whether any arbitration agreement was formed. Zeta's alternative request to dismiss Plaintiff's claims for injunctive relief should also be denied.

Dated: January 7, 2026

                          Plaintiff,
                          By Counsel,

                          By: */s/ Anthony I. Paronich*
                          Anthony I. Paronich
                          Paronich Law, P.C.
                          350 Lincoln Street, Suite 2400
                          Hingham, MA 02043
                          (617) 485-0018
                          anthony@paronichlaw.com
                          *Pro Hac Vice*

                          Brian T. Giles (0072806)
                          THE LAW OFFICES OF BRIAN T. GILES
                          1470 Apple Hill Road
                          Cincinnati, Ohio 45230
                          Telephone:  (513) 379-2715
                          Brian@GilesFirm.com